UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GUY TURI, MELISSA BALISTRERI-TURI,
SHAUN NUGENT, CHRISTINE DENTON,
LISA WELLS, SAME WELLS, LINDA
WOOD, GEORGE WOOD, ALICE                    Case No. 08-14511
BUFFINGTON, DANIEL MCCOY,                   Honorable David M. Lawson
KELLEEN URBON, and TODD URBON,

                Plaintiffs,

v.

MAIN STREET ADOPTION SERVICES, LLP,
NINA HELLER, BOB MCCLENAGHAN, and
MARCIA DEL CARPIO, also known as
MILAGRO DEL CARPIO,

                Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The plaintiffs are all couples who allege that they paid money to the defendants to assist in

arranging adoptions of children from countries other than the United States, and who were cheated

out of the fees paid based on false representations concerning the availability of the children and the

likelihood of completing the adoptions.  None of the defendants is located in or has any connection

to Michigan, and of all the plaintiffs, only Alice Buffington and Daniel McCoy reside here.  The

defendants have filed motions to dismiss for lack of personal jurisdiction, supported by affidavits

that assert facts demonstrating a lack of contact with this forum.  In addition, the defendants contest

venue in this district.  They also argue that if personal jurisdiction is found, the arbitration clauses

in the agreements require the case to be adjudicated in an arbitral forum in Pennsylvania.  The

plaintiffs have filed briefs opposing the motions, but apparently they have decided to rest on the

allegations in their pleadings, from which they construct their arguments in favor of personal jurisdiction. However, they have filed no affidavits, declarations, or other evidentiary material in opposition to the motion. The Court finds that the record supports the exercise of limited personal jurisdiction over all the defendants, except defendant Del Carpio, as to the claims of the Michigan plaintiffs only. There is personal jurisdiction over Ms. Del Carpio as to the counts of the complaint brought under the Racketeer-Influenced and Corrupt Organizations (RICO) Act. There is no personal jurisdiction in this forum over any of the defendants on the claims of the non-Michigan plaintiffs. As to the Michigan plaintiffs, venue is properly laid in this district, and the claims in the complaint do not fall within the scope of the arbitration clause in their agreement. Therefore, the Court will grant in part and deny in part the defendants' motions and dismiss the case without prejudice as to the non-Michigan plaintiffs, and dismiss certain counts of the complaint directed to defendant Del Carpio as to all plaintiffs.

## I.

The plaintiffs allege that the defendants worked with one another to carry out their fraudulent adoption business, luring hopeful parents who provided them tens of thousands of dollars without any real possibility of adoption. Defendant Main Street Adoption Services, LLP, is a Pennsylvania organization with its principal place of business in Pennsylvania. Defendant Bob McClenaghan, according to his affidavit, is the executive director of Main Street and resides in Pennsylvania. Defendant Nina Heller, according to the complaint, is the CEO and president of Main Street and resides in Pennsylvania. According to Heller's declaration, however, she resides in California. Defendant Marcia Milagro Del Carpio resides in Florida; she has an informal agreement with Main Street to perform adoption services related to Guatemalan adoptions as an independent contractor.

According to the complaint, the plaintiffs all first associated with the defendants through an internet adoption site, http://www.precious.org.  Plaintiffs Guy Turi and Melissa Balistreri-Turi, residents of Illinois, indicated an interest in a child on February 28, 2007, but were informed by Heller and McClenaghan that the child was taken.  Five weeks later, on April 6, 2007, the Main Street defendants (Main Street, McClenaghan, and Heller) contacted the plaintiffs via e-mail and asked if they would be interested in another child.  The Turis agreed, paid over $10,000 in fees, and traveled to Guatemala in July to meet the child.  While in Guatemala, the Turis came into contact with Del Carpio, who was designated as the facilitator of that adoption.  They were then told that the child was no longer available, but were offered another child.  They agreed, and after meeting the second child returned to the United States.  The Turis said they were contacted by Heller repeatedly and asked to change their minds and accept a new child.  In October 2007, the Turis were asked to pay an additional fee to complete the adoption of the second child, but by December they were told that the adoption of that child had been rejected by the Guatemalan courts.  In early 2008, defendants Heller and McClenaghan wrote to the Turis and told them theat they were working to complete the adoption of the second child.  However, in April the defendants admitted that the adoption would not be completed, and offered another child from another country.

The complaint also states that on November 4, 2006, Shaun Nugent and Christine Denton, residents of Minnesota, contacted the defendants about two children they saw on the precious.org website.  Heller e-mailed Nugent and Denton information on how much money to wire Main Street.  In December 2006 the defendants e-mailed Nugent and Denton telling them that the children that they originally desired were no longer adoptable, and that the defendants were unable to refund the money that Nugent and Denton had deposited, but the money could by applied toward another child

in Guatemala. In January 2007, the defendants notified Nugent and Denton of another child that was a possible match. Nugent and Denton undertook steps to complete the adoption, flying to Guatemala on March 31, 2007 and apparently staying there for over a year attempting to secure the adoption of that child. It appears that after hiring an attorney in Guatemala they were able to complete the adoption.

Lisa and Same Wells, residents of Louisiana, allege in the complaint that they contacted Heller via e-mail in August 2007 about adopting a child from Guatemala. After several e-mail exchanges, the Wellses paid $6,000 to cover DNA expenses, but the DNA test was not completed as promised. The Wellses sought to go to another agency but were promised by McClenaghan that Main Street's fees were the lowest. It is not clear what happened, but at some point the Wellses began working with Del Carpio. In December 2007, Del Carpio had informed the Wellses that another child had become available. In February 2008, the Wellses began working with a pediatrician named Dr. Rubio to complete the adoption of a baby named Emma. In the meantime, however, Main Street apparently continued processing the adoption of the first child, and when the Wellses refused to work with Main Street, McClenaghan filed a complaint with the United States embassy that prevented the Wellses from securing any adoption.

Linda and George Wood of Illinois allege that they decided to adopt internationally and identified a Guatemalan child on the website precious.org. They contacted Main Street and spoke at length about the process, indicating that they were wary to begin because a previous experience had gone poorly. They allege that after receiving many assurances from the defendants, the Woods agreed to contract with Main Street to complete the adoption. After a delay of about 11 months, it appeared that the adoption was going to be completed and McClenaghan demanded the final

payment.  However, despite Main Street's earlier claim that the adoption had already been completed, McClenaghan sent the Woods an e-mail that the mother had refused to sign the final document, and the process was far from complete.  They were able to contact Del Carpio (who was in Guatemala City), who informed them that the mother had changed her mind.  Heller then contacted them and offered to start the process over with another child from another country.

Kelleen and Todd Urbon, residents of Illinois, describe a similar experience in the complaint. They contacted Main Street to inquire about a boy named Darwin.  On May 24, 2007, Heller e-mailed the Urbons several photographs of another child, Alexander, and told them that they needed to decide or he would be posted on precious.org.  Heller then e-mailed the Urbons Alexander's medical reports.  On May 31, 2007 the Urbons accepted the match of Alexander.  In August 2007, Heller informed the Urbons that Alexander's birth mother had taken the children out of foster care and fled the area.  The mother was found but filed a petition to keep the children, and Heller told the Urbons that she believed the adoption of Alexander would not proceed.  Heller immediately offered the Urbons another child, whom they rejected.  When Heller offered yet another child, Daniel, the Urbons began the process over again in November 2007.  However, after the Urbons wired Main Street an additional $12,000, the United States embassy notified them that there was a problem with Daniel's birth certificate.  In the meantime, the defendants had filed a power of attorney on the Urbons' behalf without their knowledge in order to adopt another child, Yeferson.  The Urbons felt obligated to pursue this adoption; however, it did not work out.

The plaintiffs do not contend that any of the foregoing events justify litigation in the present forum.  The connection to Michigan, if any, comes through plaintiffs Alice Buffington and Daniel McCoy, who reside in Michigan.  Buffington and McCoy allege in the complaint that they contacted

-5-

the defendants in August 2006 to learn information about adopting a child from Guatemala.  They were matched with a child named Sharon.  The defendants sent Buffington agreement forms, which she signed and returned via telefax.  She also wired a $3,000 deposit and e-mailed McClenaghan and Heller asking for references.  Heller informed Buffington that there was some sort of health problem with Sharon and said she believed that it was not in Sharon's best interest to be placed with a family with two working parents.  Heller offered to return the fees or find another child, but Buffington and McCoy insisted that they be permitted to continue with the adoption.  On October 17, 2006, Buffington and McCoy wired $10,500 to Del Carpio's bank account.  The defendants then e-mailed forms to the plaintiffs to get the adoption process underway.

On January 17, 2007, Buffington e-mailed McClenaghan to find out the status of Sharon's DNA test.  McClenaghan responded via e-mail that he had attempted to contact Del Carpio, who was traveling to Guatemala, but had been unsuccessful.  On January 26, 2007, McClenaghan sent another e-mail to Buffington updating her on the progress and stating that he believed that Sharon's biological mother would have to sign off on the adoption at least once after the DNA test results.  The adoption proceeded and was submitted to the appropriate Guatemalan agency, but was rejected in June 2007 because Buffington's name had been spelled wrong by the defendants.  Buffington alleged that she traveled to Guatemala to visit Sharon in March and May, but during her June visit no one could locate Sharon.  In August, Buffington returned to Guatemala; at that time Sharon's biological mother and the foster mother demanded money from Buffington.  By May 2008, a Guatemalan judge asked the plaintiffs for a financial summary from Main Street, which was provided by McClenaghan.  This summary showed that $16,600 had been wired to Del Carpio's account.

-6-

Buffington alleges that around this same time she inquired of Heller whether they could possibly adopt an additional child from Guatemala.  Heller responded by attempting to set up a Ukrainian adoption.  A few days later, Heller e-mailed Buffington that there was a girl named Gabriella who was available for adoption, but there were errors in her birth certificate.  Heller emphasized the chaos in Guatemalan adoptions and encouraged going to Ukraine instead. Buffington and McCoy allege that so far, no adoption has taken place.

The twelve plaintiffs have joined together in a 235-paragraph complaint, which alleges eleven counts:

Count I: Violation of Racketeer-Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c), against Main Street
Count II: Violation of RICO, 18 U.S.C. § 1962(d), against Main Street
Count III: Violation of RICO, 18 U.S.C. § 1962(c), against the individual defendants
Count IV: Violation of RICO, 18 U.S.C. § 1962(d), against all defendants
Count V: Unjust enrichment, against all defendants
Count VI: Conversion, against all defendants
Count VII: Civil Conspiracy, against all defendants
Count VIII: Fraudulent Misrepresentation, against all defendants
Count IX: Innocent Misrepresentation, against all defendants
Count X: Intentional Infliction of Emotional Distress, against all defendants
Count XI: Negligent Infliction of Emotional Distress, against all defendants

Compl.  The RICO counts are premised on predicate acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.  The complaint alleges a conspiracy between Del Carpio, McClenaghan, Heller, and Main Street to obtain money and private information from the plaintiffs by sending them alternately placating and extorting communications.

Del Carpio filed a *pro se* motion to dismiss for lack of personal jurisdiction that was referred to the magistrate judge.  The Main Street defendants also filed a motion to dismiss.  The order of reference on Del Carpio's motion was withdrawn, and both motions were argued together on April 6, 2009.

-7-

In support of the motion by the Main Street defendants, McClenaghan submitted an affidavit

in which he avers as follows:

> 11. Main Street maintains no bank accounts in the State of Michigan.
> 12. Main Street has no office, mailing address, or telephone number in the State or Michigan.
> 13. Main Street maintains no agent for the service of process in the State of Michigan.
> 14. Main Street has no employees, representatives, or agents in the State of Michigan.
> 15. There is no one in the State of Michigan authorized to conduct any business on behalf of Main Street.
> 16. Main Street maintains no records or documents in the State of Michigan.
> 17. Main Street is not licensed to do business in the State of Michigan.
> 18. Main Street has not advertised in the State of Michigan.

Main Street Def.'s Mot., Ex. 7. Del Carpio's declaration asserts that she has never set foot in the

state of Michigan and has never entered into an agreement with any of the plaintiffs. She also

declares:

> 11. I have never met either of the Michigan Plaintiffs (Alice Buffington and Daniel McCoy), and have never spoken with Mr. McCoy. To the best of my recollection, I have never sent or received correspondence (including emails) from or to either of them in Michigan. To the best of my recollection, the only telephone calls that I ever had with Ms. Buffington were (a) a single call while both of us were in Guatamala [sic]; and (b) one other call while I was in Orlando, Florida (and Ms. Buffington may have been in Michigan). To the best of my recollection, I have never otherwise used the telephone, facsimile, U.S. mail, or emails into or out of Michigan, specifically including from or to any of the Plaintiffs in Michigan.

> 12. To the best of my recollection, I have never received any funds from either of the Michigan Plaintiffs. To the extent that I received payment for my services toward facilitating an adoption by the Michigan Plaintiffs, I received it from Main Street Adoption Services, LLP.

Del Carpio's Joinder, Ex. 2, Del Carpio's Decl.

II.

-8-

The Main Street defendants argue that there is no basis for finding general personal jurisdiction over them in Michigan and the plaintiffs have not established that the defendants have had sufficient contacts with Michigan to allow limited jurisdiction under Michigan's long-arm statute or the Due Process Clause. They also argue that the RICO statute, 18 U.S.C. § 1965, which allows for nationwide service of process, does not provide a basis for the exercise of jurisdiction over the defendants because this provision is applicable only when the court has personal jurisdiction over at least one of the participants in a multidistrict conspiracy and the plaintiffs show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators.

Del Carpio, who has since retained counsel, argues that there is no general or limited jurisdiction over her in this district because she never had any contact with the Michigan plaintiffs in Michigan. As noted above, she averred in her declaration that she has never sent or received correspondence (including emails) from or to either of the Michigan plaintiffs in Michigan, she spoke with plaintiff Buffington by telephone only twice, and she has never sent or received facsimile, U.S. mail, or emails into or out of Michigan. Even under RICO's nationwide service of process provisions, Sixth Circuit precedent, she contends, requires some level of minimum contacts with the forum, which are absent here.

The plaintiffs filed a brief in opposition to the motions arguing that the Main Street defendants have made sufficient contacts with plaintiffs Buffington and McCoy to satisfy the requirements of limited personal jurisdiction, and the claims of the other plaintiffs derive from the same complex of facts, so the Court may proceed with their claims as well. They point to the factors in *Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991), cited by the defendants (even though

-9-

that case deals with venue, not personal jurisdiction), and contend that application of the seven factors favors personal jurisdiction in Michigan. The plaintiffs also rely heavily on the RICO statute, contending that courts in this district have found that the nationwide service of process provision allows for personal jurisdiction in any state as long as there were minimal contacts with the United States as a whole.  The plaintiffs contend that Del Carpio is subject to this Court's jurisdiction, at least with respect to the RICO counts of the complaint, because she is a co-conspirator of the Main Street defendants.  They note that they have alleged that Del Carpio helped perpetuate the fraud with her communications with the plaintiffs.  The plaintiffs argue that RICO is designed to prevent sophisticated fraud operators from dividing litigation among several districts.

## A.

"The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum." *Leroy v. Great Western United Corp.*, 443 U.S. 173, 180 (1979).  In a motion to dismiss for want of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiffs have the burden of proving the court's jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  "Personal jurisdiction must be analyzed and established over each defendant independently." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006).

## 1.

The Sixth Circuit has stated that the question of jurisdiction can be decided on the pleadings alone. *Id.* at 893 (noting that all of the facts were taken from the complaint).  However, when the

defendant files affidavits or declarations in support of its motion to dismiss for want of personal

jurisdiction, the plaintiff must respond in kind.  The Sixth Circuit explained:

> The procedural scheme which guides the district court in disposing of Rule 12(b)(2)
> motions is well-settled.  *Serras v. First Tennessee Bank Nat. Ass'n.*, 875 F.2d 1212,
> 1214 (6th Cir. 1989). . . . [I]n the face of a properly supported motion for dismissal,
> the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set
> forth specific facts showing that the court has jurisdiction.  [*Weller v. Cromwell Oil
> Co.*, 504 F.2d 927, 930 (6th Cir. 1974))].
>
> Presented with a properly supported 12(b)(2) motion and opposition, the court has
> three procedural alternatives: it may decide the motion upon the affidavits alone; it
> may permit discovery in aid of deciding the motion; or it may conduct an evidentiary
> hearing to resolve any apparent factual questions.  *Serras*, 875 F.2d at 1214.  The
> court has discretion to select which method it will follow, and will only be reversed
> for abuse of that discretion.  *See Michigan Nat. Bank v. Quality Dinette, Inc.*, 888
> F.2d 462, 466 (6th Cir.1989); *Serras*, 875 F.2d at 1214.  However, the method
> selected will affect the burden of proof the plaintiff must bear to avoid dismissal.
> *Serras*, 875 F.2d at 1214.  The record and the text of the order in this case plainly
> indicate that the district court reached its decision based upon the parties' affidavits.
> The court expressly denied Appellant's request for further discovery and apparently
> received no testimony or other evidence at the hearing on the matter.  Where the
> court relies solely on the parties' affidavits to reach its decision, the plaintiff must
> make only a prima facie showing that personal jurisdiction exists in order to defeat
> dismissal.  *Id.*; *Am. Greetings Corp.*, 839 F.2d at 1168-69 (6th Cir. 1988); *Welsh v.
> Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980).

*Theunissen v. Matthews,* 935 F.2d 1454, 1458-59 (6th Cir. 1991).

The burden upon a plaintiff to respond to a "properly supported" motion to dismiss is not

particularly demanding.  *See, e.g.*, *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996)

(where the plaintiff offered exhibits in opposition to a motion to dismiss under Rule 12(b)(2), the

court of appeals held that the district court erred in giving weight to the defendant's contrary

affidavit to conclude there was no personal jurisdiction).  But *Theunissen*'s requirement that a

plaintiff must support her argument "by affidavit *or otherwise*" means that she must provide

*something* beyond the pleadings to show that the court has personal jurisdiction.  *See Intera Corp.*

-11-

*v. Henderson*, 428 F.3d 605, 614 (6th Cir. 2005) (noting that the district court decided the motion on the "pleadings, affidavits, and 'other evidence'" before it); *see also* 5B Fed. Prac. & Proc. Civ. 3d § 1351 ("The court may receive and weigh the contents of affidavits and *any other relevant matter* submitted by the parties to assist it in determining the jurisdictional facts.") (emphasis added).  Wright and Miller note:

> Illustrative of the type of supporting and opposing materials that have been used on various Rule 12(b) motions are the following: any admissions that have been made by counsel relating to an issue in the litigation, affidavits that may have been submitted on various issues by parties and third persons, answers to interrogatories under Rule 33, collective bargaining agreements that are in issue between the parties, a variety of other types of contracts, copyrighted material in an action for infringement of that material, depositions of both parties and nonparties, various exhibits that are attached to the pleading that is being challenged, hearsay statements in certain circumstances, issues of a magazine or other publication, court judgments and orders.

5C Fed. Prac. & Proc. Civ. 3d § 1364 (footnotes omitted); *see also Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268 (11th Cir. 2002) (considering plaintiff's evidence in the form of deposition testimony and "documentary evidence" in response to a motion to dismiss under 12(b)(2) with attached affidavits).

Several Sixth Circuit cases have instructed the district courts to look to the "pleadings and affidavits," suggesting that where jurisdictional facts are not challenged by affidavits, they may be supported by pleadings alone.  *See, e.g.*, *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *CompuServe*, 89 F.3d at 1262; *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1215 (6th Cir. 1989); *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir. 1980) (holding that the plaintiff must establish a *prima facie* case of jurisdiction in opposition to a motion to dismiss through "pleadings and affidavits"); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893

(6th Cir. 2002) (noting that all of the facts were taken from the complaint).  A recent case from a district court in Pennsylvania summarizes the rule succinctly:

> Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation.  Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person.  Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction.

*In re Chocolate Confectionary Antitrust Litigation*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009).

2.

The Sixth Circuit has explained:

> "Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[ ] due process.'" *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (citation omitted).  Where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process.

*Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003) (per curiam).

In Michigan, jurisdiction over the person can exist on the basis of general personal jurisdiction, *see* Mich. Comp. Laws §§ 600.701 and 600.711, or limited personal jurisdiction, *see* Mich. Comp. Laws §§ 600.705 and 600.715.  General personal jurisdiction invests the Court with the authority to pass judgment on a defendant regardless of where the cause of action occurred.  In the case of an individual, section 600.701 provides for general jurisdiction based on "(1) [p]resence in the state at the time when process is served;" (2) "[d]omicile in the state at the time when process is served;" and (3) "[c]onsent."  Mich. Comp. Law § 600.701.

-13-

Limited personal jurisdiction, on the other hand, may be exercised over a defendant who has certain minimum contacts with the forum, but only over claims that arise from or relate to those contacts. *Theunissen v. Matthews*, 935 F.2d 1454, 1460 (6th Cir. 1991). However, even a single contact with the forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim. *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998). According to Michigan Compiled Laws § 600.705,

> The existence of any of the following relationships between an individual . . . and the state shall constitute a sufficient basis of jurisdiction . . . to enable the court to render personal judgments against the individual . . . arising out of an act which creates any of the following relationships:
>
> (1) The transaction of any business within the state.
> (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.
> (3) The ownership, use, or possession of real or tangible personal property situated within the state.
> (4) Contracting to insure a person, property, or risk located within this state at the time of contracting.
> (5) Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.
> (6) Acting as a director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state.
> (7) Maintaining a domicile in this state while subject to a marital or family relationship which is the basis of the claim for divorce, alimony, separate maintenance, property settlement, child support, or child custody.

Mich. Comp. Law § 600.705.

The Sixth Circuit has explained that the phrase "transaction of any business" is viewed quite broadly:

> [T]he Michigan Supreme Court stated that "[t]he word 'any' means just what it says. It includes 'each' and 'every'. . . . It comprehends the 'slightest'." *Lanier v. Am. Board of Endodontics*, 843 F.2d 901, 905-06 (6th Cir. [1988]) (quoting [*Sifers v. Horen*, 385 Mich. 195, 199 n.2, 188 N.W.2d 623, 624 n.2 (1971)]). This construction

-14-

> applies with equal force to section 705. *Hertzberg & Noveck v. Spoon*, 681 F.2d 474, 478 (6th Cir. 1982).

*Theunissen*, 935 F.2d at 1463-64. As a result, "this Circuit historically has understood Michigan to intend its long-arm statute to extend to the boundaries of the fourteenth amendment." *Id.* at 1462. To pass muster under the Due Process Clause of the Fourteenth Amendment, the assertion of personal jurisdiction is measured against the following test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Neogen Corp.*, 282 F.3d at 890 (quoting *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). "Purposeful availment" occurs when "the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Ibid.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Ibid.* (quoting *Burger King Corp.*, 471 U.S. at 475). On the other hand, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (internal quotation omitted). "The acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001).

-15-

"If prongs one and two of the *Southern Machine* test are satisfied, then there is an inference that the reasonableness prong is satisfied as well." *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005). In the Sixth Circuit, courts also determine the reasonableness of exercising personal jurisdiction over a defendant by weighing several factors, including "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Ibid.*

## B.

The defendants assert that their lack of contacts with this forum precludes the assertion of general personal jurisdiction over them. The plaintiffs concede that point, but they insist that limited personal jurisdiction can be premised on the Main Street defendants' purposeful availment of the privilege of doing business with Michigan residents, that is, with plaintiffs Buffington and McCoy. The conclusion that the Main Street defendants did business with Michigan residents is based, in turn, on the argument that "the Defendant solicited for and transacted business in Michigan." Pls.' Br. at 6. The plaintiffs have not set forth specific facts to support these arguments, and they have not offered any evidence beyond the complaint to establish these claims. The Court is left with the task of perusing the exhibits to the complaint to determine if the Main Street defendants have initiated sufficient contacts with this district in their dealings with Buffington and McCoy to justify the exercise of limited jurisdiction.

The complaint filed in this case includes several exhibits consisting of various e-mail strings documenting communications by the Main Street defendants with Buffington and, in one case, McCoy. *See* Compl. Exs. NN-ZZ. The texts of the e-mails do not suggest that the Main Street defendants initiated contact with the Michigan plaintiffs or otherwise solicited their business.

-16-

Rather, the e-mails originated by the defendants all appear to be in response to inquiries by the plaintiffs. In fact, the Michigan plaintiffs allege that they were the ones who first contacted the Main Street defendants, not the other way around. *See* Compl. ¶ 110. The plaintiffs' argument in their brief that the Main Street defendants solicited their business in Michigan is not supported by any factual material in the record.

Nonetheless, the e-mails do demonstrate that the Main Street defendants established a relationship with the plaintiffs in Michigan that spanned several months and that was based on a written agreement. Under the first of the *Southern Machine* requirements, "purposeful availment" is found when "the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Neogen*, 282 F.3d at 890 (citing *Burger King*, 471 U.S. at 475). It is well established that "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (internal quotation omitted).

The Supreme Court explained in *Burger King v. Rudzewicz* that the purposeful availment requirement addresses the protection provided by the Due Process Clause of an individual's liberty interest in not being subjected to binding judgments of a foreign jurisdiction absent "fair warning" that its activity may bring it within the authority of those courts. *Burger King*, 471 U.S. at 471-72. In the context of limited personal jurisdiction, this "fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* at 472 (internal quotation and citation omitted). As concerns interstate contractual obligations, the Court

-17-

"emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions in the other state for the consequences of their activities." *Id.* at 473 (internal quotations omitted). In other words, when a nonresident defendant purposefully directs its activities at residents of the forum state, he opens the door to the assertion of jurisdiction. *Ibid.* However, it is the defendants' – not the plaintiffs' – purposeful action that is determinative: "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state." *Id.* at 474 (internal quotations omitted).

In this case, it appears that it was the Michigan plaintiffs who reached out to the defendants in Pennsylvania to create the relationship that matured into a written contract. However, the fact that the Michigan plaintiffs initiated the contact does not render personal jurisdiction inappropriate, especially where the defendants responded and developed a legal relationship with Michigan residents. By agreeing to provide adoption services for a Michigan couple, the defendants knowingly availed themselves of the privilege of conducting business in Michigan. Through their execution of the contract, the defendants bound themselves to assist in the placement of a foreign child with the Michigan plaintiffs and they should have known their conduct would have a substantial effect on the residents of this forum. By doing this, the defendants deliberately engaged in significant activities in this forum, making the exercise of jurisdiction presumptively reasonable, *Burger King*, 471 U.S. at 475-76, since that conduct should have provided "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment).

The second *Southern Machine* requirement – that the cause of action arise from the defendants' activity in the forum – is satisfied as well.  The court of appeals addressed the "arising from" component of the test in *Lanier v. American Board of Endodontics*, 843 F.2d 901, 908-09 (6th Cir. 1988).  There, a female dentist sued the Illinois-based American Board of Endodontics alleging that she was denied a license by the Board on the basis of gender.  The Board filed a motion to dismiss, arguing that it had insufficient minimum contacts with the State of Michigan.  The court of appeals disagreed.  After finding that the Board had transacted business within Michigan by exchanging correspondence and telephone calls with the plaintiff, in addition to collecting her application fee, the court found that the plaintiff's cause of action arose out of those business transactions.  The court considered two possible theories defining the "arising from" requirement: whether the business transactions "made possible" the cause of action; and whether the cause of action arose in the "wake" of the business transactions.  Applying both theories, the Court held that the discrimination was made possible and occurred in the wake of the plaintiff's filing of her application, which the Court previously had found to constitute the transaction of business in Michigan by the Board.  *Id.* at 908-09.

The court found that the application process, evaluation, testing, and rejection were part of a "mosaic of activity," "every step of which was a constituent part of the whole."  *Id.* at 908.  The court reasoned that if the defendant discriminated against Dr. Lanier on account of her gender, it "must have done so, based at least in part, upon what it learned about her from its professional business contacts with her in Michigan during the very earliest stages of the application process."  *Id.* at 909.  Because those contacts made possible the rejection and concomitant discrimination, and

-19-

the cause of action lay in the wake of them, the court found that the claims arose from the contacts with the forum.

The essence of the Michigan plaintiffs' claims in the present case is fraud perpetrated through the Main Street defendants' communications with the plaintiff via telephone calls and e-mails (only the latter of which is supported by evidentiary submissions). The court of appeals has held that serial communications by a defendant from outside the forum state to a plaintiff within the forum that form the basis of the alleged fraud amount to sufficient contacts to confer limited personal jurisdiction. *See Neal*, 270 F.3d at 332-33 (noting that the defendant "engaged in a course of conduct over a period of time that involved a single business transaction . . . with plaintiffs, conducted by phone and fax. The actions that constitute the entire transaction were the allegedly fraudulent communications and these same communications form the bases for plaintiffs' tort claims. The alleged misrepresentations are the elements of the cause of action itself") (citations omitted). The plaintiffs here allege that the communication stream represented by the e-mails was part of a scheme to lead them on and cause them to send more money in the hope of consummating an adoption that the Main Street defendants knew would never occur. The Court finds, therefore, that the Michigan plaintiffs' cause of action arises from the Main Street defendants' activity in this forum.

The third *Southern Machine* requirement is that exercising personal jurisdiction over the defendants is reasonable. The Court believes it is with respect to the claims of Buffington and McCoy. The factors discussed in *Intera Corp. v. Henderson* all favor the exercise of personal jurisdiction in this forum. The Main Street defendants apparently conduct a nationwide business of assisting in foreign adoptions. Their customers, including the plaintiffs in this case, hail from

states other than Pennsylvania, Main Street's headquarters, so the burden on the defendants of dealing with out-of-state litigation is little more than doing business with out-of-state clients. Michigan has a stake in protecting its residents against fraud, so the forum state's interest in conducting the litigation here is evident. The Michigan plaintiffs likewise have a strong interest in obtaining relief. And there is no evidence that Pennsylvania's interest in securing an efficient resolution of the dispute will be compromised by the litigation proceeding here. *See Intera Corp.*, 428 F.3d at 618.

The Court concludes, therefore, that it has limited personal jurisdiction over the Main Street defendants to adjudicate the claims of Buffington and McCoy.

### C.

The plaintiffs argue that if there is jurisdiction over the Michigan plaintiffs claims, then there is "pendent jurisdiction over the claims of the non-Michigan residents." Pls.' Br. at 5. They cite no authority for that proposition, and the Court has found none.

If there were general personal jurisdiction over the defendants, they would be subject to suit in this forum by any foreign plaintiff. But "limited personal jurisdiction confers power upon the court to enter personal judgments against the defendant only upon claim(s) which arise out of the acts establishing the jurisdictional connection between the defendant and the forum." *Theunissen*, 935 F.2d at 1463 n.4. The authority conferred by limited personal jurisdiction, therefore, is claim specific. *See Remick v. Manfredy*, 238 F.3d 248, 256-59 (3d Cir. 2001) (holding that the district court had limited personal jurisdiction over this defendant concerning a claim for breach of contract, but not with respect to a defamation claim); *Phillips Exeter Academy v. Howard Philips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999) (commending district court's claim-specific analysis). "If a

defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006). "That analysis is sensible, given that a primary purpose of the protection provided by the Due Process Clause is to give individuals 'fair warning that *a particular activity* may subject [them] to the jurisdiction of a foreign sovereign.'" *Salom Enterprises, LLC v. TS Trim Industries, Inc.*, 464 F. Supp. 2d 676, 685 (E.D. Mich. 2006) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)) (emphasis added).

The claims by the non-Michigan plaintiffs mirror those of Buffington and McCoy. However, the plaintiffs concede that these individuals had no contact with this forum, and the defendants committed no acts that independently justify the exercise of limited personal jurisdiction in Michigan with respect to those claims. The claims of the individual plaintiffs, although similar to one another, are discrete, and each claim must stand on its own basis of jurisdiction. The Court concludes, therefore, that where there are multiple plaintiffs and multiple claims, "[t]he personal jurisdiction analysis . . . must be plaintiff-specific." *Arnold v. Goldstar Financial Systems, Inc.*, No. 01 C 7694, 2002 WL 1941546, at *3 (N.D. Ill. Aug. 22, 2002) (citing *Phillips Exeter Academy*, 196 F.3d at 289). The Court finds no basis to exercise personal jurisdiction over the claims of the non-Michigan plaintiffs against the defendants.

### D.

There is no evidentiary material in the record suggesting that defendant that Del Carpio communicated with the plaintiffs while they were in Michigan, although she does admit to participating in a telephone call on one occasion, and that this may have been while Buffington was

-22-

in Michigan.  On its own, this is simply insufficient to establish personal jurisdiction over Del Carpio.  *See Neogen Corp.*, 282 F.3d at 890  (finding no personal jurisdiction as a result of "random," "fortuitous," or "attenuated" contacts).

To remedy this inadequacy, the plaintiffs argue that Del Carpio was a conspirator of the Main Street defendants, so she should be held to answer here.  The point is woefully underdeveloped in the plaintiffs' filings.  The Sixth Circuit has acknowledged a legal theory adopted by some courts that acts performed by a defendant's co-conspirators "are attributable to [the defendant] for the purpose of establishing the minimum contacts necessary to the court's exercise of personal jurisdiction." *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1236 (6th Cir. 1981).  However, it held in that case that it need not decide the issue because the plaintiff's allegations that the defendant was part of a conspiracy were unsupported by any specific facts or evidentiary support; in contrast, the defendants put forth affidavits denying that the out-of-state defendant had anything to do with the events cited in the complaint.  Later cases in the Sixth Circuit have dismissed conspiracy claims on the basis that the allegations of conspiracy were "unsupported." *See, e.g.*, *Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1155 n.3 (6th Cir. 1990); *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988).

Whether this theory is actually a viable one is unsettled.  *See Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 513-14 & nn.33-34 (S.D. Iowa 2007) (collecting cases); *see also* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L.Rev. 234, 251-54 (1983).  The district courts in this circuit have split on the issue, *see American Copper & Brass, Inc. v. Mueller Europe, Ltd.*, 452 F. Supp. 2d 821, 829 (W.D. Tenn. 2006) (collecting cases); however, the judges in this district have recognized a conspiracy approach

-23-

to personal jurisdiction.  *See Bromley v. Bromley*, 2005 WL 1838511, *2+ (E.D. Mich. Jul. 29, 2005) (Zatkoff, J.); *General Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F. Supp. 656, 665 (E.D. Mich. 1996) (Edmunds, J.).  Other circuit courts have subscribed to this theory, upon the requisite showing.  *See Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005); *Second Amendment Foundation v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) ("If through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction. The analogy to agency is even more direct here, because the complaint alleges that Dolan and First Heritage were leagued in a RICO enterprise, and if Livesey was the agent of the enterprise, what more should be necessary to bring the enterprise, and hence First Heritage, a principal in it, within the long arm of the long-arm statute?").  Those courts allowing a plaintiff to proceed under a conspiracy theory have insisted upon specific facts showing the participation in a conspiracy affecting the forum state that, when challenged by evidentiary support, is supported by some evidence.

Although the viability of the conspiracy theory of personal jurisdiction is supported by the weight of authority, the plaintiffs have not met their burden of showing that the application of this principle is appropriate to Del Carpio.  They have alleged facts against her tending to show a conspiracy, but the Sixth Circuit has insisted that such allegations be supported with some evidentiary material when opposing a properly supported motion to dismiss for lack of personal jurisdiction.  There are some e-mail exchanges involving Del Carpio, but none of these  establish her involvement in a conspiracy targeting the Michigan plaintiffs.  There is no basis to conclude, therefore, that there is personal jurisdiction over Del Carpio under Michigan's long-arm statute.

-24-

E.

The plaintiffs argue that even if Del Carpio has no contacts with Michigan, the broad provisions of the RICO statute allow nationwide service of process, and the defendant need only have minimum contacts with the United States.  They point to the following provision in the RICO Act:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.
>
> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.
>
> (c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpoenas issued by such court to compel the attendance of witnesses may be served in any other judicial district . . . .
>
> (d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

The Sixth Circuit has not decided whether and when this statute finds personal jurisdiction without contacts to the forum state.  However, in cases dealing with other statutes containing nationwide service of process provisions, the court has held that the proper focus of the inquiry is whether the defendant had minimum contacts with the United States.  For instance, in *Medical Mut. of Ohio v. deSoto*, 245 F.3d 561(6th Cir. 2001), the court held that a provision in the Employment Retirement Income Security Act (ERISA) allowing "process may be served in any other district where a defendant resides or may be found process may be served in any other district where a

-25-

defendant resides or may be found," 29 U.S.C. § 1132(e)(2), conferred nationwide personal jurisdiction, requiring courts to "ask whether the defendant has sufficient minimum contacts with the United States," rather than asking "whether the defendant has sufficient minimum contacts with the forum state for the exercise of jurisdiction to comport with traditional notions of fair play and substantial justice, as courts do when relying on a state's long-arm statute to establish territorial jurisdiction." *Id.* at 566-67. And in *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993), the court held that a provision of the Securities Act that stated, "Any suit . . . to enforce any liability or duty created by this chapter . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant. . . .", 15 U.S.C. § 78aa, "confer[red] personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States." *Id.* at 1330.

The service-of-process provisions of RICO are similar but not identical to their counterparts in ERISA and the Securities Act. RICO requires first that a suit may be commenced only in "any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Once a suit is commenced against a defendant in the proper district, RICO authorizes nationwide service of process only on "other parties" upon a showing that the "ends of justice require" it. 18 U.S.C. § 1965(b).

The Circuits have not interpreted these subsections of section 1965 uniformly. Courts agree that once jurisdiction is obtained over one defendant, jurisdiction over the other defendants can be found under certain circumstances. However, courts have differed over whether this provision creates nationwide personal jurisdiction when no defendant is reachable. *See FC Inv. Group LC v.*

-26-

*IFX Markets, Ltd.*, 529 F.3d 1087, 1099 (D.C. Cir. 2008) (collecting cases). The Eleventh Circuit

focused on section 1965(d), which allows "all other process" to be served in any judicial district and

concluded that "[w]hen a federal statute provides for nationwide service of process, it becomes the

statutory basis for personal jurisdiction." *Republic of Panama v. BCCI Holdings (Luxembourg)*, 119

F.3d 935, 942 (11th Cir. 1997). The Seventh Circuit viewed section 19065(a) as merely a venue

provision and held that section 1965(b) was the provision that "creates personal jurisdiction by

authorizing service." *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987). That

court held that "the national government is entitled to sanction [the defendant] for civil wrongs

committed within the territory of the United States," and that the defendant "may not demand that

the court applying the law of the United States be conveniently located." *Ibid.*; *see also ESAB

Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997)

The weight of authority and the majority of recent decisions, however, hold that section 1965

provides for national personal jurisdiction only if the court has personal jurisdiction over one of the

defendants, and there is no other district in which a court has jurisdiction over all co-conspirators.

*See FC Inv. Group LC*, 529 F.3d at 1099-1100 (citing *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226,

1231 (10th Cir. 2006); *PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70 (2d Cir.

1998); *Butcher's Union Local No. 498 v. SDC Inv. Inc.*, 788 F.2d 535, 538 (9th Cir. 1986)). These

cases consider section 1965 as an integrated whole, as exemplified by the Second Circuit's reasoning

in *PT United Can*:

> Reading all of the subsections of § 1965 together, the court finds that § 1965 does
> not provide for nationwide personal jurisdiction over every defendant in every civil
> RICO case, no matter where the defendant is found. First, § 1965(a) grants personal
> jurisdiction over an initial defendant in a civil RICO case to the district court for the
> district in which that person resides, has an agent, or transacts his or her affairs. In
> other words, a civil RICO action can only be brought in a district court where

-27-

personal jurisdiction based on minimum contacts is established as to at least one defendant.

Second, § 1965(b) provides for nationwide service and jurisdiction over "other parties" not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants. This jurisdiction is not automatic but requires a showing that the "ends of justice" so require. This is an unsurprising limitation. There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought. Congress has expressed a preference in § 1965 to avoid, where possible, ha[i]ling defendants into far flung fora.

Next, § 1965(c) simply refers to service of subpoenas on witnesses. Thus, § 1965(d)'s reference to "[a]ll other process," means process other than a summons of a defendant or subpoena of a witness. This interpretation, one which gives meaning to the word "other" by reading sequentially to understand "other" as meaning "different from that already stated in subsections (a)-(c)," gives coherent effect to all sections of § 1965, and effectively provides for all eventualities without rendering any of the sections duplicative, without impeding RICO actions and without unnecessarily burdening parties.

138 F.3d at 71-72 (emphases added) (footnote omitted).

The Court finds the reasoning of the majority of circuits more persuasive. Read as a whole, section 1965 states that once a suit is commenced by a plaintiff in a district where at least one defendant "resides, is found, has an agent, or transacts his affairs," 18 U.S.C. § 1965(a), then "other parties residing in any other district [may] be brought before the court," and those parties may "be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof," as long as the "ends of justice require" such action. 18 U.S.C. § 1965(b). RICO's service of process provisions do not help the non-Michigan plaintiffs, who cannot properly commence an action against any of the defendants in this district. But the provisions may assist the Michigan plaintiffs in summoning Del Carpio into this district.

-28-

The question then becomes whether the "ends of justice" require the utilization of nationwide service of process to bring Del Carpio into this district. *See* 18 U.S.C. § 1965(b). The Tenth Circuit has held that the phrase should be broadly construed in accordance with RICO's remedial purpose. *See Cory*, 468 F.3d at 1232 (citing H.R. Rep. No. 91-1549 (1970)). Some courts have required that there be no other district where all defendants could be sued. *See Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Investment, Inc.*, 788 F.2d 535, 539 (9th Cir. 1986); *800537 Ontario, Inc. v. Auto Enterprises, Inc.*, 113 F. Supp. 2d 1116, 1128 (E.D. Mich. 2008). However, the Tenth Circuit rejected this rigid approach in favor of "a flexible concept uniquely tailored to the facts of each case," discussing the legislative history of the provision and case law interpreting analogous provisions of the Sherman Act. *Cory*, 468 F.3d at 1232. Courts have also held that the "ends of justice" require that the plaintiff's complaint arguably states a claim for relief under RICO. *E&M Properties, Inc. v. Razorgator, Inc.*, No. 08-10377, 2008 WL 1837261, at *7 (E.D. Mich. Apr. 23, 2008). The "ends of justice" required by the nationwide service of process found in the Sherman Act, 15 U.S.C. § 5, on which RICO's provision was based, *Cory*, 468 F.3d at 1232, has been interpreted to apply when one of the defendants's "presence" was in the district. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 46 (1911).

In this case, the plaintiffs have alleged that Del Carpio is an equal participant in the RICO conspiracy with the Main Street defendants. The complaint states a colorable claim under RICO, describing a scheme in which the Main Street defendants dealt with the plaintiffs in the United States while Del Carpio delivered funds – or not – "in country." Because of RICO's remedial purpose, the Court finds that the ends of justice favor the exercise of personal jurisdiction over Del

-29-

Carpio with respect to the counts of the complaint brought under RICO.  The Court finds no basis supporting personal jurisdiction over her as to the other counts.

III.

The defendants also claim that venue is not properly laid in this district.  In civil cases where jurisdiction is not premised solely on diversity, venue is proper in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).  The language requiring a "substantial part of the events giving rise to the claim" has been interpreted to allow a plaintiff to "file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose; this includes any forum with a substantial connection to the plaintiff's claim." *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998).  "To establish a substantial connection to the claim, it is generally sufficient to demonstrate that injury or loss alleged in the lawsuit occurred in the chosen venue." *Bay County Democratic Party v. Land*, 340 F. Supp. 2d 802, 809 (E.D. Mich. 2004) (citing *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 41-43 (1st Cir. 2001)).

Section 1391 further contains a specific subsection dealing with the propriety of venue when corporations are parties to a dispute:

> (c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there

-30-

is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

28 U.S.C. § 1391(c).

The Court held earlier that Main Street is subject to personal jurisdiction in this district; therefore, it is deemed to reside here. *See* 28 U.S.C. § 1391(c). However, since not all defendants reside in the same state, section 1391(b)(1) is inapplicable.

Turning, then to the question whether Michigan has a substantial connection to the controversy, the plaintiffs have alleged that the defendants committed a tort against them, and the effects of this tort were felt in Michigan. That is all that is required under the venue provision. *See Bay County Democratic Party*, 340 F. Supp. 2d at 809. As long as there is a substantial connection to this district, section 1391(b)(2) is satisfied. The Court finds, therefore, that venue is properly laid in this district as to the Michigan plaintiffs.

IV.

Finally, the Main Street defendants argue that an arbitration provision in the adoption assistance contract requires dismissal. The plaintiffs' agreements with Main Street contain the following arbitration clause:

> Any controversy or claim arising out of this agreement if less than or equal to $5,000 shall be resolved by an action in small claims court of the Municipal Court of the City of and County of Lancaster Pennsylvania. If a claim regarding fees charged by us exceeds $5,000, it shall be resolved by arbitration in the City of Lancaster Pennsylvania, administered by the American Arbitration Association in accordance with its Arbitration Rules for Adoption Agencies and Related Services Disputes, such arbitrator(s) may be entered in any court having jurisdiction. In agreeing to arbitration, we both acknowledge that, in the event of a dispute over fees charged by us, each party is giving up the right to have the dispute decided in a court of law before a judge or jury and instead we are accepting the use of arbitration for resolution of this matter. In any such dispute, whether resolved by arbitration or lawsuit, the prevailing party will be entitled to attorney's fees and costs.

Main Street Defs.' Mot, Ex. 12 (agreement with McCoy & Buffington).

In the Federal Arbitration Act, Congress has expressed "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "This policy, however, is not so broad that it compels the arbitration of issues not within the scope of the parties' arbitration agreement." *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008) (citing *Nestle Waters North Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007); *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "'Before compelling an unwilling party to arbitrate, [a] court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.'" *Ibid.* (quoting *Bratt Enters.*, 338 F.3d at 612). In this Circuit, "district courts are 'required to give a general presumption of arbitrability and to resolve any doubts in favor of arbitration.'" *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Intern., Ltd.*, 556 F.3d 459, 470 (6th Cir. 2009) (quoting *Watson Wyatt*, 513 F.3d at 650); *see also AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960))). However, the Court is not to "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

-32-

The arbitration clause in this case is not a broad provision compelling arbitration of any dispute arising out of the parties' relationship; instead, it is a specific, limited, and unambiguous provision restricted to a "claim regarding fees charged by us" or "a dispute over fees." In *Bratt Enterprises*, the Sixth Circuit held that an agreement that required arbitration of any disagreement "with any of the amounts included in the Closing Balance Sheet" did not apply to a dispute over who was liable for the amounts owed, even though determining the person responsible for payment is an inherent part of any payment plan. 338 F.3d at 614. In this case, certainly the plaintiffs seek to recover fees paid, presumably in their unjust enrichment count, but they also allege fraud, conspiracy, misrepresentation, and violations of RICO, and they are claiming that the defendants' tortious conduct caused them injuries beyond the fees charged. None of this can be characterized properly as "a claim regarding fees charged by us." This Court can say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf Navigation Co.*, 363 U.S. at 582-83. Moreover, the plaintiffs have named as defendants individuals beyond those with whom they have a written agreement. The Court finds that the arbitration agreement does not cover the plaintiffs' dispute with the defendants.

V.

The Court finds that there is limited personal jurisdiction under Michigan's long-arm statute over the Main Street defendants with respect to the Michigan plaintiffs only. There is personal jurisdiction over defendant Del Carpio under RICO as to the Michigan plaintiffs, but only as to the RICO counts. There is no personal jurisdiction in this district over any defendant as to the non-Michigan plaintiffs. As to the claims over which this Court has personal jurisdiction, venue is

-33-

properly laid in this district, and the plaintiffs' claims are not barred by the arbitration clause in the adoption assistance agreement.

Accordingly, it is **ORDERED** that the motion to dismiss by defendant Marcia Del Carpio [dkt #10] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the motion to dismiss by defendants Main Street Adoption Services, LLP, Nina Heller, and Bob McClenaghan [dkt #16] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the claims of plaintiffs Guy Turi, Melissa Balistreri-Turi, Shaun Nugent, Christine Denton, Lisa Wells, Same Wells, Linda Wood, George Wood, Kelleen Urbon, and Todd Urbon against all defendants, and the claims of plaintiffs Alice Buffington and Daniel McCoy against defendant Marcia Del Carpio in counts V, VI, VIII, IX, X, and XI of the complaint, are **DISMISSED WITHOUT PREJUDICE**.


                                          s/David M. Lawson
                                          DAVID M. LAWSON
                                          United States District Judge

Dated:  September 9, 2009


**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 9, 2009.

                          s/Lisa M. Ware
                          LISA M. WARE

-34-